UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| TODD A. B.,[1]<br><br>     Plaintiff,<br><br> vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner, Social Security<br>Administration,<br><br>     Defendant. | CIV. 14-5086-JLV<br><br><br>ORDER |

## INTRODUCTION

Plaintiff Todd B. filed a complaint appealing from an administrative law judge's ("ALJ") decision denying disability insurance benefits. (Docket 1). Defendant denies plaintiff is entitled to benefits. (Docket 10). On March 24, 2016, the court entered an order granting plaintiff's motion for a sentence six remand ("remand order"). (Docket 23 at p. 12). On September 25, 2017, plaintiff filed a motion to reopen the case to permit him to appeal the Commissioner's partially unfavorable decision of April 25, 2017. (Docket 32). The court granted the motion and issued a briefing schedule requiring the parties to file a supplemental joint statement of material facts ("SJSMF").

---

[1]The Administrative Office of the Judiciary suggested the court be more mindful of protecting from public access the private information in Social Security opinions and orders. For that reason, the Western Division of the District of South Dakota will use the first name and last initial of every non-governmental person mentioned in the opinion. This includes the names of non-governmental parties appearing in case captions.

(Docket 35).   The parties filed their SJSMF.   (Docket 36).   Plaintiff filed a motion to reverse the decision of the Commissioner.   (Docket 39).   The Commissioner resists plaintiff's motion.   (Docket 41).   For the reasons stated below, plaintiff's motion to reverse (Docket 39) is granted in part and denied in part.

## FACTUAL AND PROCEDURAL HISTORY

The parties' initial joint statement of material facts ("JSMF") (Docket 13), initial joint statement of disputed material facts ("JSDMF") (Docket 14) and the more recent SJSMF (Docket 36) are incorporated by reference.   Further recitation of salient facts is incorporated in the discussion section of this order.

On January 19, 2012, Todd B. filed an application for disability insurance benefits ("DIB") alleging an onset of disability date of July 6, 2009. (Docket 13 ¶ 1).   Following the remand order, on April 25, 2017, a second ALJ issued a decision finding Todd B. was not disabled from July 9, 2009, through August 25, 2014, but was disabled and DIB qualified beginning August 26, 2014.   (Docket 36 ¶ 16; see also Administrative Record at pp. 493-507 (hereinafter "AR at p. ____").   On June 2, 2017, the Appeals Council submitted the certified supplemental administrative record, thereby affirming the ALJ's decision.   (Docket 36 ¶ 17).   The ALJ's decision constitutes the final decision of the Commissioner of the Social Security Administration.   It is from this decision which plaintiff timely appeals.

The issue before the court is whether the ALJ's decision of April 25, 2017, that Todd B. "has been disabled under . . . the Social Security Act

beginning on August 26, 2014," is supported by substantial evidence in the record as a whole.   (AR at p. 506); see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The court delineated the standard of review of a decision of the Commissioner in the remand order and incorporates that standard by reference.   (Docket 23 at pp. 3-4).

## THE REMAND ORDER

The ALJ previously held that Todd B. was "insured through December 31, 2013,"[2] and "the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits."   Id. at pp. 10-11 (referencing AR at p. 11).   The question before the court was "whether [Todd B.] was a viable candidate for spinal surgery" in 2011.   Id. at p. 7.   That question was based on the following medical evidence.

> On July 18, 2011, neurosurgeon Dr. [Robert I.] charted that [Todd B.] suffered "discogenic and facetogenic back pain with abnormal motion at L4-5 and some foraminal stenosis." Id. (citing Docket 13 ¶ 213).   Dr. [Robert I.] recommended "a lumbar fusion and decompression at L4-5 with instrumentation and transforaminal lumbar interbody fusion." Id. (citing Docket 13 ¶ 213).   On September 29, 2011, orthopedic surgeon Dr. [Rand S.] concluded [Todd B.] was not a good candidate for lumbar fusion surgery. Id.

---

[2]This date was later corrected by the ALJ to December 31, 2014.   (AR at pp. 493-94).

(referencing Docket 13 ¶ 215). Dr. [Rand S.] opined that even "a multilevel fusion . . . is not going to make [Todd B.] that much more functional." Id. (citing Docket 13 ¶ 215). . . .

On December 12, 2014, orthopedic surgeon Dr. [Wade J.] conducted an independent medical examination of [Todd B.] . . . . Id. at p. 8 (citing Docket 14 ¶ 1). Dr. [Wade J.] concluded "[t]he surgery offered by Dr. [Robert I.] would be only part of the surgery necessary. He would benefit more [from a] L4-5, L5-S1 decompression and fusion. If the L5-S1 level is left untreated with the isthmic spondylolisthesis,[3] I think this could potentially lead to further degenerative changes and compressive neurological problems. . . . I think he needs a 2-level fusion not a 1-level fusion." Id. (citing Docket 14 ¶ 6). . . .

On July 16, 2015, Dr. [Robert I.] performed a two-level fusion at L4-L5 and L5-S1 and a laminectomy[4] with medial facetectomy[5] and foraminotomy[6] at L4-L5. Id.

---

[3]Spondylolisthesis is defined as the "forward displacement (olisthy) of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis." Dorland's Illustrated Medical Dictionary, 32nd ed., 2012 at p. 1754.

[4]"A laminectomy creates space by removing the lamina—the back part of the vertebra that covers [the] spinal canal. Also known as decompression surgery, laminectomy enlarges [the] spinal canal to relieve pressure on the spinal cord or nerves." (Docket 23 at p. 8 n.3) (internal citation and quotation marks omitted).

[5]"Medial facetectomy is a spinal procedure that partially removes one or both of the facet joints on a set of vertebrae. The procedure intends to decompress the spinal nerves being pinched by degenerated facet joints." (Docket 23 at p. 8 n.4) (internal citation omitted).

[6]"A foraminotomy is a decompression surgery that is performed to enlarge the passageway where a spinal nerve root exits the spinal canal." (Docket 23 at p. 8 n.5) (internal citation omitted).

It was with this medical history that the court found:

> [T]he July 16, 2015, report of surgery relates back to [Todd B.'s] condition during a period of insurability and most accurately describes the nature and extent of his spinal condition. Without the vantage point of surgery, no physician was truly able to determine the nature and full extent of [Todd B.'s] condition. It was only after surgery that Dr. [Robert I.] could conclusively determine the physiological condition of [Todd B.'s] spine and the extent of the surgical intervention necessary.

Id. at p. 11. The remand order found "this new evidence is relevant to step three as to whether [Todd B.] satisfies the medical equivalency provision of Listing 1.00; step four as to [Todd B.'s] credibility and the resulting RFC; and step five as to whether [Todd B.] is disabled." Id. at p. 12.

The remand order contained the following directives to the Commissioner:

> IT IS FURTHER ORDERED that the Commissioner shall provide [Todd B.] with a *de novo* hearing before an administrative law judge. The ALJ shall obtain and admit evidence of [Todd B.'s] July 16, 2015, hospitalization and surgery at the Black Hills Surgical Hospital (Docket 20-1) and any additional evidence which relates to the physiological consequences of that surgery.
>
> IT IS FURTHER ORDERED that the ALJ shall evaluate the newly admitted evidence and reevaluate [Todd B.'s] claim at steps three through five of the sequential evaluation process for determining whether an individual is disabled and entitled to disability benefits under Title II. 20 CFR § 404.1520(a).

Id.

## THE PRESENT APPEAL

Following the ALJ's partially favorable decision of April 25, 2017, plaintiff appealed to the district court. (Docket 39). That challenge objects to "the

ALJ's decision finding that [p]laintiff was not disabled before August 26, 2014."

Id.  Plaintiff asserts five grounds to challenge the ALJ's decision.  Those are

summarized as follows:

> 1.  The ALJ's finding of an August 26, 2014, onset date was not supported by substantial evidence.
>
> 2.  At step three the substantial evidence supports a finding that plaintiff's impairment met or equaled Listing 1.04A.
>
> 3.  The ALJ applied the wrong standard for judging the intensity, persistence and limitation of plaintiff's symptoms prior to August 26, 2014.
>
> 4.  The ALJ failed to properly consider whether pulmonary sarcoidosis impacted the residual functional capacity analysis.
>
> 5.  The ALJ should have sought a consultative evaluation regarding plaintiff's diagnosis of pulmonary sarcoidosis.

(Docket 40).  These challenges will be addressed as the court finds

appropriate.

1.  THE ALJ'S FINDING OF AN AUGUST 26, 2014, ONSET DATE WAS
NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

The ALJ based the onset date of August 26, 2014, on an MRI of Todd B.'s

lumbar spine on that date.  (AR at p. 504).  "On August 26, 2014, an MRI of

the claimant's lumbar spine, when compared to a similar imaging scan from

November 2012, revealed subtle anterolisthesis [spondylolisthesis] of L5 on S1,

more conspicuous in August 2014.  The remainder of the imaging was

similar."  Id.  The ALJ noted Dr. Wade J.'s review of the evidence in

December 2014 concluded Todd B. would "benefit from a two level lumbar

fusion at L4-S1." Id.   The ALJ acknowledged the 2015 lumbar surgery and

that "[s]ymptoms that resulted in the surgery likely relate back to the August

26, 2014 lumbar MRI and are supportive of disability as of the established

onset date." Id.   The ALJ gave great weight to the opinion of consulting

physician, Dr. Kendrick, because he "was objective and reviewed the record as

a whole through the date of the hearing." Id. at p. 505.   The ALJ found Dr.

Kendrick "generally concluded the claimant's symptoms and clinical

presentation prior to August 26, 2014 were not work preclusive.   Thereafter,

he felt the MRI on that date demonstrated the claimant's pain would have been

work preclusive." Id.

Arguments

Plaintiff objects to the findings of the ALJ.   (Docket 40 at pp. 23-27).

He argues:

> Between [Todd B.'s] alleged onset date of July 2009 and the ALJ's
> established onset date of August 26, 2014, no causative or
> meaningful difference appears in the clinical evidence of [Todd B.'s]
> disabling pain and limitations. . . . [He] had radicular pain, limited
> range of motion, motor loss with antalgic gait, reflex loss, and
> sensory loss. . . . Dr. [Wade J.] said MRIs from July 28, 2009 through
> November 8, 2012 showed similar findings without significant
> progressive abnormalities. . . . And Dr. Kendrick said the MRIs from
> 2011 to 2015 were virtually the same.

Id. at p. 26 (referencing Docket 36 ¶¶ 61 & 138;[7] other references to plaintiff's

earlier brief omitted).   Plaintiff contends the ALJ improperly shaped the

---

[7]Plaintiff acknowledges he mistakenly cited ¶ 45.   (Docket 44 at
p. 4 n.2).

questions to Dr. Kendrick in order to formulate a finding the ALJ wanted the evidence to support.  Id. at pp. 26-27.

The Commissioner argues "[p]laintiff contradicts himself by arguing that his symptoms were the same in 2009 as in 2014, yet also admitting his lumbar impairment was a progressive condition."  (Docket 41 at p. 4 n.2) (emphasis omitted).  The Commissioner contends "Dr. Kendrick reached his opinion by noting 'there was no real urgency' to have surgery in 2011."  Id. at p. 4 (referencing Docket 36 ¶ 141).  "In accordance with the . . . regulations," the Commissioner argues "the ALJ properly considered this opinion, along with a review 'of all the medical findings and other evidence that support a medical source's statement that' Plaintiff was disabled as of August 26, 2014."  Id. at p. 5 (citing 20 CFR § 404.1527(d)(1)).

In rebuttal, plaintiff reiterates his contention "that the ALJ engaged Dr. Kendrick to develop evidence to deny the claim or shorten the period of disability, shown by his adversarial shaping of Dr. Kendrick's responses." (Docket 44 at p. 3).  Plaintiff contends the ALJ engaged in this inquiry to commit the doctor "to opine disability criteria as of August the 26th, 2014. . . . To support this, the record had to show medical worsening on that date."  Id. at p. 4 (referencing Docket 36 ¶¶ 147-48).  Plaintiff submits his earlier argument supporting a July 2009 onset date is supported by the record.  Id.

Analysis

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Choate v.

Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580.

"Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted). The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

The Commissioner failed to recognize the directive of the remand order:

> The court finds the July 16, 2015, report of surgery relates back to [Todd B.'s] condition during a period of insurability and most accurately describes the nature and extent of his spinal condition. Without the vantage point of surgery, no physician was truly able to determine the nature and full extent of [Todd B.'s] condition. It was only after surgery that Dr. [Robert I.] could conclusively determine the physiological condition of [Todd B.'s] spine and the extent of the surgical intervention necessary.

(Docket 23 at p. 11). It was the "vantage point of surgery" which permitted Dr. Robert I. to "conclusively determine the physiological condition" of plaintiff's spine and it was with this evidence the ALJ was compelled to re-evaluate the MRIs of 2011 and 2014 and plaintiff's testimony. Id.

Dr. Kendrick summarized the court's directive most cogently. "[Y]ou really can't go completely by the MRI. You have to go by the patient's symptomatology." (AR at p. 587). Todd B.'s symptomatology, that is the set of characteristics of his medical condition, required him to undergo a two-level fusion at L4-L5 and L5-S1 and a laminectomy with medial facetectomy and foraminotomy at L4-L5. (Docket 23 at p. 8) (referencing Docket 20-1).

To get a comprehensive understanding of Todd B.'s physiological condition, a review of his historic MRIs and related medical information is necessary. The relevant images begin in 2009.

A July 24, 2009, MRI report identified the following: "At L5 there were bilateral pars defects that allowed L5 to sublux anteriorly by 3 millimeters with respect to L4 and S1. This did not appear to cause significant spinal stenosis or nerve root compression. The spinal canal was 'large on a developmental basis.' " (Docket 13 ¶ 90) (citing AR at p. 258).

On December 8, 2009, board-certified radiologist, Dr. Gilbert M. compared a current lumbar spine MRI with the July 24, 2009, MRI report. Id. ¶ 108. His findings included chronic pars defects at L5 and minimal spondylolisthesis, annular tears at L4-L5 and L3-L4. Id. He recommended

additional diagnostic imaging.  Id. ¶ 109.  On December 15, 2009, Dr. Gilbert

M. interpreted a new MRI of the lumbar spine.  Id. ¶ 110.  His findings on

that date concluded the L5-S1 level demonstrated minimal bulging disc and

minimal facet degenerative change.  Id. ¶ 112.  The report noted chronic

spondylolysis[8] at L5 and grade 1 spondylolisthesis[9] at L5-S1.  Id.  The L4-L5

level showed a shallow bulging disc and facet degenerative change.  Id.

A May 24, 2011, MRI report identified the following relevant findings:

L4-5: Mild retrolisthesis,[10] shallow broad-based disc displacement
which is   mixed in the left foraminal   position along with mild right
and mild to moderate left-sided facet hypertrophy,[11]  contributing to

---

[8]Spondylolysis is defined as the "dissolution of a vertebra; a condition
marked by platyspondylia, aplasia of the vertebral arch, and separation of the
pars interarticularis."  Dorland's Illustrated Medical Dictionary, 32nd ed.,
2012 at p. 1754.

[9]A grade 1 spondylolisthesis indicates that up to 25% of the vertebrae
has slipped forward over the vertebra below.  https://www.spineuniverse.com
/conditions/spondylolisthesis/spondylolisthesis-back-condition-treatment.

[10]"Retrolisthesis, or backwards slippage of a vertebra, . . . . occurs when a
single vertebra slips and moves back along the intervertebral disc underneath
or above it."  https://www.healthline.com/health/retrolisthesis.

[11]"Facet Hypertrophy is the term used to describe a degeneration and
enlargement of the facet joints. . . . The facet joint may become enlarged as part
of the body's response to degeneration of the spine, i.e. to try to provide
additional stability to counteract the instability from degenerative disc disease.
The joint can enlarge to the point where it puts pressure on the adjacent nerves
in the spine, which in turn can cause pain to radiate along the path of the
nerve (e.g. sciatica)."  https://www.spine-health.com/glossary
/hypertrophic-facet-disease.

mild to moderate right, and moderate left-sided exiting neural foraminal stenosis[12] and abutment of the exiting left L4 nerve. . . . ; [and]

L5-S1: Minimal disc displacement, suggestion of chronic bilateral spondylolysis and facet hypertrophy, contributes to no definite compressive arthropathy.

Id. ¶ 201.   The radiologist made a direct comparison with MRIs of December 8 and 15, 2009, and found no identifying differences.   (AR at p. 286) (emphasis added).

On May 27, 2011, Physiatrist Dr. Christopher D. "opined that [Todd B.] had failed attempts at epidurals and titration of medications and has continued/ significant low back/lumbosacral region pain and right lower extremity radicular pain.   He presented in mild to moderate distress.   He has significant tenderness in the low back/lumbosacral region and has radicular pain down the right lower extremity in an L4-5 distribution."   (Docket 13 ¶ 203 (internal quotation marks and citation omitted).

On June 22, 2011, comparing x-rays taken that day with the MRI of May 24, 2011, Dr. Robert I. concluded "these show . . . air in the disc space at L4-5. He has a slip noted at L4-5.   It does not appear to move too much with flexion/extension.   He also has some degenerative changes around that level

_____

[12]"Neural foraminal stenosis refers to compression of a spinal nerve as it leaves the spinal canal through the foramen (the opening between the vertebrae through which spinal nerve roots travel and exit to other parts of the body). Neural foraminal stenosis may . . . be caused by an osteophyte [bone spur], a foraminal herniated disc, or collapse of the disc space." https://www.spine-health.com/glossary/neural-foraminal-stenosis.

. . . . His MRI scan shows him to have [pathological] changes at that level and some foraminal stenosis secondary to bulging disc." Id. ¶ 208. The doctor ordered a bone scan because "[if] the joint shows abnormality, then he will probably need a fusion at that level." Id. ¶ 209.

Following a June 27, 2011, bone scan, Dr. Robert I. charted Todd B. "has degeneration at L4-5 and I think that is the source of his back pain. He has some abnormal opening of the disc space. It fishmouths at that level and he has air in the disc space at that level. He does have some spondylolisthesis at that level as well as at the level below, but this does not appear to be significant at L5-S1." Id. ¶¶ 210 & 212. The doctor's assessment was "discogenic and facetogenic back pain with abnormal motion at L4-5 and some foraminal stenosis." Id. ¶ 213. Dr. Robert I.'s recommendation and plan was "a lumbar fusion and decompression at L4-5 with instrumentation and transforaminal lumbar interbody fusion." Id. Because Todd B.'s condition was related to a worker's compensation injury and the insurance carrier would not authorize the procedure, the surgery did not occur.

On September 29, 2011, another orthopedic surgeon, Dr. Rand S. saw Todd B. on a referral from Dr. Christopher D. (Docket 13 ¶ 214). After reviewing historical MRIs, Dr. Rand S. observed "[h]is MRI shows disc collapse and degeneration at [L4-L5]. He appears to have a spondylolysis at [L5-S1]. He does not have any central or lateral recess stenosis. He may have a little

foraminal narrowing at [L4-L5]." Id. ¶ 215.   The orthopedic surgeon did not

feel Todd B. was a good candidate for a lumbar fusion.

> [I]n my opinion I think the probability of a fusion, especially at 4-5, giving him significant relief, enough to go back to . . . work is very, very low.   The source of his back and leg pain remains elusive.   It certainly could be the [L4-L5] as well as the [L5-S1] interval.   I think a multilevel fusion . . . is not going to make him that much more functional.

Id.; see also AR at p. 371.

> MRI imaging of November 8, 2012, disclosed the following:

> Findings at L4-5 were facet arthropathy,[13] retrolisthesis of L4 on L5, foraminal stenosis, and stable findings in comparison to the May 24, 2011 MRI[; and]

> Findings at L5-S1 were a broad disc bulge and annular rent with findings stable compared to the May 24, 2011 MRI.

(Docket 36 ¶ 33) (emphasis added).

On July 29, 2013, Todd B. was seen by Dr. Robert I.   Id. ¶ 40.   Lumbar

spine x-rays were ordered which disclosed Todd B. "has a slip at L4-5 that

moves with flexion and extension.   He has loss of disk height.   He has

vacuum disk phenomenon . . . ."   Id. ¶ 43.   A MRI identified only as

"somewhat old," disclosed "severe [pathological] changes at [L4-L5]."   Id.   The

---

[13]"Facet arthropathy occurs when the facet joints [located along the back of the spine] degenerate or become worn down.   In particular, the protective cushion between the facet joints that are made up of cartilage and fluid may become thinner or damaged through wear and tear.   As a result, the bones in the joints may rub together or not move as they should, which causes pain, swelling, and stiffness."   https://www.medicalnewstoday.com /articles/320355.php.

doctor's recommendation was again to perform a "lumbar fusion at L4-5 due to the instability." Id. ¶ 44. Todd B. agreed to the procedure. Id. The next day, Dr. Robert I.'s clinic faxed a request to the worker's compensation insurance carrier seeking approval for a L4-L5 "transverse lumbar interbody fusion." Id. ¶ 41. The worker's compensation insurance carrier again refused to authorize surgery so Todd B. initiated an insurance bad faith tort claim. (AR at p. 1198).

On August 26, 2014, a lumbar MRI scan was obtained. (AR at pp. 1168-69). The findings were:

L4-5: Moderate decreased disc height and desiccation.[14] Endplate irregularity secondary to osteochondrosis[15] with sterile reactive bony endplate changes leftward. Subtle retrolisthesis of L4 on L5. Concentric disc bulge with annular rent and underlying endplate spondylosis with mild left facet arthropathy results in moderate foraminal narrowing left greater than right with abutment of the exiting L4 nerve roots bilaterally also left greater than right[; and]

L5-S1: Mild decreased disc height and desiccation. Subtle grade 1 anterolisthesis [spondylolisthesis] of L5 on S1 secondary to left unilateral pars defect of L5. Disc bulge with annular rent gently

---

[14]"Disc desiccation . . . refers to the dehydration of [vertebral] discs. [The] vertebral discs are full of fluid, which keeps them both flexible and sturdy. As [the result of age or trauma], the discs begin to dehydrate or slowly lose their fluid. The disc's fluid is replaced by fibrocartilage, the tough, fibrous tissue that makes up the outer portion of the disc." https://www.healthline.com/health/disc-desiccation#treatment.

[15]"Intervertebral osteochondrosis represents the pathologic degenerative process involving the intervertebral disc and the respective vertebral body endplates . . . It is characterised [sic] by disc space narrowing, severe disc fissuring, vacuum phenomenon, endplate cartilage erosions, and vertebral body reactive changes . . . ." https://radiopaedia.org/articles/intervertebral-osteochondrosis.

abuts the existing left L5 nerve root without central canal stenosis
or foraminal stenosis.    Unfused S1 posterior spinous process.

Id. at p. 1169; see also Docket 36 ¶ 53.    The radiologist concluded "[w]hen

comparison is made with previous written report and images dated November

8, 2012, subtle anterolisthesis [spondylolisthesis] of L5 on S1 is more

conspicuous on the current examination.    The remainder of the examination

is similar."    (AR at p. 1169) (emphasis added).

On December 12, 2014, orthopedic surgeon Dr. Wade J. conducted a

records review for the worker's compensation insurance carrier.    (Docket

36 ¶¶ 58 & 63).    Dr. Wade J. reviewed the MRIs of July 28, 2009; December 8,

2009; December 15, 2009; May 24, 2011; and November 8, 2012.    Id. ¶ 61.

He noted all the MRIs "showed similar findings without significant

progressive abnormalities."    Id. (emphasis added).    The doctor concluded Todd

B. needed "a 2-level fusion," but did "not think this was a work-related

condition."    Id. ¶ 63.    Because of the physician's opinion, the insurance

carrier did not authorize surgery.

The MRI lumbar spine imaging of May 1, 2015, disclosed the following:

L4-5: 2mm apophyseal-based retrolisthesis.    No central canal
stenosis or thecal sac compression evident.    Moderate left greater
than right foraminal narrowing effaces the exiting L4 nerve roots in
combination with facet arthropathy. . . . 12 degrees dextroscoliosis
centered at the L4 level noted[; and]

L5-S1: Shallow central disc displacement.    No central canal
stenosis or thecal sac compression evident.    Posterior central
annular tear evident.

(AR at p. 1397-98; <u>see</u> <u>also</u> Docket 36 ¶ 65).   The radiologist concluded:

> L4-5 . . . Posterior central annular tear. . . . Mixed spondylotic disc displacement without central canal stenosis. . . . Moderate biforaminal narrowing effaces the exiting L4 nerve roots in combination with facet arthropathy[; and]
>
> L5-S1 . . . Posterior central annular tear. . . . No central canal stenosis or foraminal compromise. . . . Mild facet arthropathy . . . . <u>Stable appearance of the lumbar spine compared to the prior exam of August 26, 2014</u>.

(AR at p. 1398) (emphasis added).

On May 4, 2015, Dr. Robert I. saw Todd B. for continuing back pain. (AR at p. 1339; <u>see</u> <u>also</u> Docket 36 ¶ 66).   The doctor charted "[w]e have been recommending surgery for the last couple of years and I think now it is time to recommend further surgery."   (AR at p. 1339).   X-rays taken that day disclosed the following:

> [Todd B.] has a slip on L4 on L5 and slip of L5 on S-1.   He appears to have a spina bifida occulta at L5-S1.   There is a little slight rotation of the spine . . . . He has got loss of disc height quite significant at L4-5 and also present at L5-S1 but not as significant . . . . MRI shows annular tear at L5-S1, minor change at L4-5.   It does appear to be fairly lined up on the MRI compared to his plain films.

(AR at p. 1339).   Dr. Robert I.'s assessment was "[s]evere degeneration L4-5, L5-S1 with slip seen at both levels.   Discogenic facetogenic back pain."   <u>Id.</u> Dr. Robert I. recommended a "transforaminal lumbar interbody fusion L4-5, L5-S1."   <u>Id.</u> at p. 1340; <u>see</u> <u>also</u> Docket 36 ¶ 66.   On May 6, 2015, the worker's compensation insurance company authorized surgery.   (Docket 36 ¶ 67).

17

Viewing the historical MRIs and medical record in light of the July 2015 surgery, it is evident that at least since May 24, 2011, Todd B.'s lumbar spine condition had progressed to the point that future MRI reports acknowledged there were no significant differences going forward. See Docket 36 ¶ 33 (November 2012 findings consistent with May 2011 findings); id. ¶ 61 (2009 through 2012 MRIs showed similar findings without significant progressive abnormalities); id. ¶ 53 (other than L5-SI spondylolisthesis being more conspicuous, the August 2014 findings are similar to the November 2012 finding); id. ¶ 65 & AR at p. 1398 (May 2015 findings are consistent with the August 2014 findings); Docket 36 ¶ 138 (Dr. Kendrick did not "see a whole lot of difference between that MRI [May 1, 2015] and the one in 2011."); id. ¶ 143 (comparing the 2011 MRI with the August 2014 MRI, Dr. Kendrick testified "they're very similar.").

Dr. Kendrick's conclusion that surgery in 2011 was nothing urgent was premised on his perception that surgery was elective at that time. Stated another way, Dr. Kendrick concluded Todd B. was not seeking surgery in 2011, but waited until 2015 when the pain became debilitating. This premise contradicts the record. When Dr. Robert I. recommended a L4-L5 fusion in 2011, the surgery did not occur because Todd B. elected not to have surgery but rather because the worker's compensation insurance carrier refused to authorize the procedure. Dr. Kendrick agreed the procedure was "not a necessity" in 2011 because the ALJ posed the question in this fashion: "the surgery could be supported by the medical records but at that time, in 2011, it was elective because it was not a necessity in that if [Todd B.] did not elect to

have surgery, there was no indications of . . . [the] possibility of loss of function of the lower extremities or anything like that . . . ." (AR at p. 587). Dr. Kendrick testified "[t]here was no real urgency about the surgery" because Dr. Robert I. had examined Todd B. in 2013 and found "some minor sensory loss" on both the right and left side, "but no motor loss." Id. But what Dr. Kendrick ignored or failed to consider is that Dr. Robert I. recommended surgery in 2011, 2013 and 2015, yet the worker's compensation insurance carrier refused to pay for the procedure. (Dockets 13 ¶ 213 & 36 ¶¶ 41 & 66). On May 4, 2015, Dr. Robert I. charted he had "been recommending surgery for the last couple of years." (Docket 36 ¶ 66). Todd B.'s pain was debilitating in 2011 and that is why he agreed when Dr. Robert I. recommended lumbar fusion surgery. It was not the lack of debilitating pain which constituted a roadblock to surgery, but rather the worker's compensation insurance carrier's refusal to pay for the procedure.

The questions which remained unanswered in the 2011 through 2014 MRIs were answered by the 2015 surgery. Todd B. suffered from debilitating lumbar spine structural injuries from at least as early as May 2011. The ALJ erred in fact by failing to properly consider the earlier MRIs in light of the March 24, 2016, remand order. See Docket 23 at p. 11 ("The court finds the July 16, 2015, report of surgery relates back to [Todd B.'s] condition during a period of insurability and most accurately describes the nature and extent of his spinal condition."). Those injuries warrant a finding that Todd B.'s disability onset date was May 24, 2011.

Plaintiff carried his burden of proof that May 24, 2011, is the proper date of onset of disability for purposes of computing and paying benefits. The evidence discussed above and this finding "fairly detract[]" from the ALJ's decision about the date of onset of disability. <u>Reed</u>, 399 F.3d at 920. The ALJ erred in fact and the decision was not supported by the substantial evidence in the record as a whole. 42 U.S.C. § 405(g); <u>Choate</u>, 457 F.3d at 869; <u>Howard</u>, 255 F.3d at 580.

Plaintiff has not carried his burden of proof as to an earlier date of onset of disability. The other issues raised by plaintiff need not be addressed as they will not affect the onset date of disability and would not otherwise qualify plaintiff for benefits at an earlier date.

## ORDER

Based on the above analysis, it is

ORDERED that plaintiff's motion to reverse the decision of the Commissioner (Docket 39) is granted in part and denied in part.

IT IS FURTHER ORDERED that the decision of the Commissioner of April 25, 2017, is reversed and the case is remanded to the Commissioner for the purpose of calculating and awarding benefits to plaintiff Todd B. beginning May 24, 2011.

Dated September 20, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE